DREYFUS et al. v. MARINE TRANSIT CORPORATION (MURPHY, Claimant).*

No. 4721.

Circuit Court of Appeals, Third Circuit.

Sept. 29, 1932.

*Rehearing denied November 21, 1932.

See, also, 54 F.(2d) 86.

John A. Lyon, of New York City (Henry E. Otto, of New York City, of counsel), for appellants.

Courtland Palmer, of New York City, for appellee Marine Transit Corporation.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for appellee Mary Murphy.

Before WOOLLEY, DAVIS, and THOMPSON, Circuit Judges.

WOOLLEY, Circuit Judge.

The firm of Louis Dreyfus Company filed a libel in personam against the Marine Transit Corporation and Mary Murphy, charterer and owner, and in rem against the Barge "Supreme" for cargo damage. They alleged a cause of action in contract on the theory of bailment and sought recovery (as if from a common carrier) on allegations of delivery of a cargo of wheat in good condition to the craft at Buffalo and her delivery of a part of the cargo to the consignee at New York in bad condition. On proof of these allegations alone the libellants rested, maintaining they had made out a prima facie case—whether of breach of contract to deliver, or unseaworthiness of the barge, or negligence of the carrier or of the owner is not very clear. However, the learned trial court, turning to the libel, discovered that the contract of affreightment included, by reference, the terms of the New York Produce Exchange Canal Grain Charter Party No. 1 as amended, and that this standard charter party provided that: "The boat owner and/or operator and/or carrier shall be responsible for all damage caused by their negligence or fault but shall not be liable for losses caused by dangers of navigation, * * * except when caused by their negligence or fault." Believing, we surmise, that the libellants could not set up a cause of action different from one arising from the contract into which they had entered for the shipment of their grain, the learned trial judge indicated to counsel that, under the terms of the contract, the carrier was only liable for cargo damage resulting from its negligence, that negligence could not be presumed from bad condition of the cargo when delivered at the port of discharge but, to recover on the contract, negligence must be proved, and that lacking such evidence he was disposed to dismiss the libel. The libellants stood fast on their prima facie case and asked the court to make a ruling on the question, which it did by (orally) dismissing the libel. Immediately the libellants moved the court to reopen the case and admit their proof of negligence. This the court did and the case went to final decree against the libellants on the proofs. They appealed and assign as one of the court's errors its first dismissal of the libel.

While on the question of prima facie case there was for a moment a decree in the form of an oral judicial pronouncement which the libellants could have accepted and from which, after entry, they could have appealed, it so happened they themselves asked that the decree be vacated and the case reopened. As that was done, clearly there stands in this record no decree dismissing the libel on a prima facie case and, in consequence, there is no basis for review on this appeal of the court's action in that regard.

Whether the court was right or wrong, the libellants, abandoning the theory of bailment, took a fresh hold and proceeded in the case on a new theory, that of the unseaworthiness of the barge and negligence of the carrier under the contract, the burden of proving which they voluntarily assumed. The respondents, with equal alacrity, assumed the burden of proving the opposite. So, without deciding where lay the burden in law, the trial court, as will this court, regarded the issues as purely ones of fact and accordingly disposed of the case not on legal presumptions but on the evidence.

The evidence introduced by the libellants is directed to unseaworthiness of the barge and negligence of both the carrier and owner. Opposed to this the carrier went forward and introduced evidence to show generally lack of negligence and particularly how the damage happened. If its explanation on the proofs be accepted, it will not only relieve itself of responsibility but will also exonerate Mary Murphy, the owner, because the explanation applies equally to her. While ordinarily there is in law a difference between liability of the carrier and of the owner for cargo damage to the shipper, there is no difference on the facts of this case which, however viewed, turns on the evidence of unseaworthiness and negligence.

Unlike most admiralty cases there is here practically no dispute about the evidence. The case therefore must be decided on the permissible inferences.

Undoubtedly a part of the cargo was damaged by water. Equally certain water got to the cargo through a leak at the starboard stern angle iron. The angle iron in question was about three-quarters of an inch thick and four inches wide. One leg of the angle ran along the starboard side four feet; the other leg across the stern the same distance. Its position on the hull was such that when the barge was light it would be well out of the water; and when loaded it would be in or out according to the draft.

■ On the issue of seaworthiness of the barge for cargo, the libellants proved that before her trip west from New York to Buffalo, by way of the Hudson River and the Erie Canal, the captain of the barge, an employee of the owner under the charter party, discovered that this angle iron was loose; that the owner told him to proceed with a load of sulphur to Buffalo and have it repaired there; that when in Buffalo some one told him to have it repaired when he got back to New York; and that when he got back to New York with the libellants' cargo aboard his attention was called by the captain of the barge next to his that the starboard leg of the iron was standing out at about right angles to the starboard side of the hull. Spikes having been pulled out, water had seeped through the spike holes into the cargo.

Against this seemingly plain evidence of cargo unseaworthiness the respondents proved that the barge had last been in dry dock for repairs three months before the trip in question; and that, on discovering at New York the loose angle iron with three spikes in it and one spike out, the captain plugged the one spike hole with wood, drove in another spike and made the iron firm and sound. The barge then proceeded to Buffalo with a cargo of sulphur so small as to leave the angle iron above water. After discharging this cargo at Buffalo, the barge was inspected by the captain who found her sound, and by agents and underwriters for the libellants who certified that she was "worthy to load dry cargo within ten days." She then took on the libellants' cargo of wheat, which was large enough to sink the angle iron below the water, and proceeded in tow upon her trip eastward through the Erie Canal to Troy, thence down the Hudson River to New York, the port of discharge. There, shortly after arrival, the captain was shown the starboard leg of the angle iron partly ripped from the hull and standing out. Two spikes had been pulled out, leaving two spike holes through which, undoubtedly, water had entered and

was then entering the hold. The two other spikes remained in place. On this evidence bearing directly upon the issue of seaworthiness, as on the evidence upon the issue of negligence bearing indirectly upon the issue of seaworthiness which we shall state presently, we find ourselves in accord with the holding of the learned trial judge that when the barge took on cargo at Buffalo she was seaworthy for cargo purposes.

■ On the issue of negligence committed by the captain of the barge, the owner's servant, and imputed as well to the carrier, the libellants proved that the barge captain, on being shown the leg of the angle iron standing out in a way to be dangerous to the barge next to her in the tow, fastened a line to it and the capstan and tore off the iron, thus negligently doing the thing which caused the craft to leak. The respondents, however, went forward and explained the leak from a different and prior cause. They produced evidence to show that somewhere between Troy and New York the angle iron must have been chafed or rubbed loose, causing a leak which fell within the dangers of navigation, liability for which was excepted by the charter party. This evidence is in substance as follows:

Leaving Buffalo and moving eastward, the barge passed through the canal in tow with the angle iron a foot below the surface of the water. Pursuant to his custom, the captain measured her for water twice a day, morning and night. On reaching Troy he pumped her out dry. The amount of water pumped was no more than usual for the lapsed period, indicating that she had not leaked when going through the canal, and indicating also that through the canal the angle iron held fast. At Troy the barge was put into a tow and headed down the river. At Albany she had three inches of water in her bilges. This was more than was expected. Farther down the river she showed four inches, which was more than she had ever taken in and was an ominous amount. Within an hour after the angle iron had been stripped off in New York she showed six inches. This was four hours after she had arrived. At different times on the river trip the "Supreme" had a steel barge, light, lashed to her starboard side.

From this evidence we find that the leak was caused and damage done not by the captain tearing the loose angle iron from the hull at the end of the trip but by some contact with the iron during the voyage from Troy to New York, which fell within an exception of the charter party. We are led to

this finding by the fact that vastly more water entered the hold than could have entered through the two spike holes made by tearing off the iron in New York Harbor. Therefore the accident must have occurred up river during the trip of two and one-half days from Troy. We are fortified in this conclusion by the proven facts that the barge did not leak in the canal where the water is fresh and that the water which damaged the cargo was salt water, obtainable only from the Hudson River and obtained so recently as not to cause the wet wheat to cake, which normally occurs within three or four days. If the leakage was increased by the act of the captain, at the end of the trip, tearing off the angle iron and making two more spike holes, the amount of water which thereby entered the hold in this short period was not proved and therefore cannot be apportioned with that which had previously entered from an excepted cause. In consequence, there is no way of measuring the damage caused by the excepted act and damage occasioned by the act of the captain, even were it negligent, in tearing off the angle iron to prevent injury to nearby shipping. We are inclined to believe that damage by his act was by comparison inconsiderable. However, as there is no evidence on the point, we make no finding.

Holding against the libellants on both issues of unseaworthiness and negligence, the decree dismissing the libel is affirmed.